735 A.2d 67

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Arthur FAULKNER, Appellant.**

Supreme Court of Pennsylvania.

Submitted Oct. 27, 1998.

Decided June 24, 1999.

Reargument Denied Aug. 19, 1999.

William R. McElroy, Hatboro, for A. Faulkner,

Patricia E. Coonahan, Norristown, Robert A. Graci, Harrisburg, for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

## OPINION

CAPPY, Justice.

This is a direct appeal from the decision of the trial court denying appellant's request for relief pursuant to the Post-Conviction Relief Act. (PCRA).[1] For the reasons set forth herein, the order of the trial court is affirmed.

Appellant was convicted of two counts of first-degree murder and sentenced to death for each count on June 5, 1989.[2] The judgment of sentence was affirmed on direct appeal at *Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28 (1991). The United States Supreme Court denied a petition for writ of certiorari on April 20, 1992. On January 16, 1997 a *pro se*

---

1. 42 Pa.C.S. § 9546(d).

2. Appellant was also convicted of rape, involuntary deviate sexual intercourse, two counts of attempted murder, criminal intent and possession of instruments of crime. The sentences on these counts were imposed concurrent to the two death sentences.

petition for post-conviction relief was filed. Counsel was appointed and an amended petition was filed on April 14, 1997. The Commonwealth filed an answer to the petition and a motion to dismiss the petition. A hearing was held on May 2, 1997 and the petition was denied. This appeal followed.

In order to dispose of this appeal it is necessary to briefly summarize the factual predicate for the underlying convictions. Those convictions followed from the events of April 1, 1988. On that date appellant was scheduled to work with Ms. Dorner and Ms. Killoran at SJS Archeological Services at 10 Woodmont Road in Lower Merion Township, Pennsylvania. Anne Jensen and Glenn Sheehan (husband and wife), who resided at 3 Woodmont Road, a few doors away from their business address, owned SJS. At approximately 10:00 a.m. Ms. Jensen, who was pregnant at the time, walked into the office and encountered appellant coming down the steps from the second floor. Appellant passed her on the stairs then grabbed her from behind, held a knife to her chest and forced her up the stairs to the second floor office. Ms. Jensen observed that the office was in disarray with blood and water on the floor.

While being held by appellant Ms. Jensen saw Ms. Killoran coming up the stairs. Ms. Jensen warned Ms. Killoran to run away and get help because appellant had a knife. As Ms. Killoran began to run appellant stabbed Ms. Jensen in the back several times, threw her down and pursued Ms. Killoran. In need of assistance Ms. Jensen managed to exit the building whereupon she observed appellant stabbing Ms. Killoran whom was lying on the ground in a fetal position. Ms. Jensen fled in another direction. The first two people she approached fled without coming to her aid. Ms. Jensen ultimately rolled down a hill to avoid appellant and was found on the roadway. Ms. Jensen was taken to the hospital and treated; she and her fetus survived.

During the attack on Ms. Jensen and Ms. Killoran, Mr. Sheehan, who was at 3 Woodmont Road, overheard his wife scream. Mr. Sheehan ran outside and encountered Ms. Killoran lying on the ground in a pool of blood. As he assured her that he would get help, appellant approached grabbing Mr.

Sheehan in a bear hug. Appellant stabbed Mr. Sheehan several times before Mr. Sheehan could break free. As Mr. Sheehan ran for help he saw appellant bend over Ms. Killoran saying, "I've got to get the keys". When the police arrived the body of Ms. Dorner was found in the second floor office tied to a chair, she had been sexually assaulted and stabbed to death. Ms. Killoran died from her wounds; Mr. Sheehan survived the assault.

Appellant was ultimately arrested in New York City, New York when he was observed parked illegally in Ms. Killoran's car, which had been reported stolen. Lower Merion township police interviewed appellant while in custody in New York. Appellant was extradited to Pennsylvania for trial on this matter.

In the petition for post-conviction relief appellant raises three issues alleging the ineffectiveness of trial counsel. *See* 42 Pa.C.S. § 9543(2)(ii). To establish ineffective assistance of counsel appellant must demonstrate that the underlying claim is of arguable merit, counsel's decision regarding said claim was not reasonably intended to advance appellant's interest, and that appellant suffered prejudice because of counsel's error. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). Where appellant cannot establish prejudice, a claim of ineffectiveness may be dismissed on that basis alone. *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352 (1995), *cert. denied*, 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). Prejudice is established where the record shows that counsel's error had an adverse effect on the outcome of the proceeding. *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988). Previously litigated claims will not support an allegation of ineffectiveness premised upon a new theory of relief. *Commonwealth v. Beasley*, 544 Pa. 554, 678 A.2d 773, 778 (1996).

Appellant's first allegation of ineffectiveness is premised upon counsel's failure to argue New York law as a basis for the suppression of statements made by appellant while in custody following his arrest in New York City. Appellant avers

that under New York law he was not properly advised of his *Miranda* rights when the interrogating detectives handed him a "rights" card to read and sign, without verbally apprising him of his rights. This claim fails for several reasons.

At the suppression hearing held on November 14, 1988 appellant moved to suppress the statements made during the New York interrogation on the basis that the Commonwealth failed to establish that appellant understood the "rights" card he allegedly read and signed prior to making the incriminating statements. At that hearing appellant asserted that there was no proof he understood his rights because of the manner in which he was advised. Appellant argued that the Commonwealth proved only that he "looked" at the card handed to him, not that he actually read the card and comprehended the information printed thereon. (N.T. 11/14/88 pp. 83–86). In response, the Commonwealth established that the detectives knew appellant was a high school graduate and that they asked him if he could read before handing him the card. After appellant reviewed both sides of the card the detective asked him if he understood the card. Appellant replied affirmatively and signed the card, acknowledging his understanding of the rights contained therein. (N.T. 11/14/88 pp. 27–34). The trial court denied suppression finding the requirements of *Miranda* were met and the statements were made voluntarily. (N.T. 11/14/88 p. 97).

Appellant avers that the trial court's ruling on the suppression motion would have been different if trial counsel had argued that New York law should be applied in determining the validity of the manner in which appellant was informed of his *Miranda* rights. Appellant offers the decision in *People v. Sirno*, 151 A.D.2d 621, 542 N.Y.S.2d 368 (1989) as support for this argument. In *Sirno* the defendant was verbally given his rights in English, and at his request, was supplied a rights card in Spanish. The issue before the court was whether the Spanish card was sufficient as it did not contain the question "do you understand?" The court found that the requirements of *Miranda* were met under the totality of the circumstances. *Sirno*, 542 N.Y.S.2d at 370. Appellant's reliance on *Sirno* is

misplaced as that case does not explicitly require that *Miranda* warnings be given verbally, nor does it condemn the process of handing a "rights" card to the accused to read and sign, acknowledging thereby that the card was read and the rights contained therein understood.

In addition to appellant's failure to establish the arguable merit of his claim that New York law required a different outcome as to his suppression motion, we note that this argument is merely an attempt to relitigate the suppression motion under a new theory. As stated in *Beasley*, attempts to revive previously litigated issues under new theories alleging ineffectiveness of prior counsel will not be grounds for relief under the PCRA.

In his second claim of ineffectiveness appellant argues that trial counsel erred in pursuing a strategy in his cross-examination of Mr. Sheehan, which opened the door to testimony revealing appellant's prior criminal record. In order to address this issue it is necessary to understand the context within which the objectionable testimony arose.

Appellant's proffered defense was guilty but mentally ill. On direct examination Mr. Sheehan had testified that appellant acted and spoke in a normal rational way during the five months of employment preceding the events of April 1,1988. Testimony that appellant acted in a normal rational manner for several months preceding the assaults and murders would be detrimental to the defense. On cross-examination trial counsel attempted to attack Mr. Sheehan's credibility by showing the jury that the witness had a financial motive for offering testimony that appellant acted and spoke in a normal rational manner for the months preceding the attack. Mr. Sheehan and his wife had filed a lawsuit, seeking money damages from the Salvation Army shortly after the assault by appellant. Mr. Sheehan had originally hired appellant through a program of the Salvation Army. Trial counsel attempted to elicit from the witness that the lawsuit was motivated by the Salvation Army's failure to reveal appellant's psychological background to Sheehan and his wife. Specifical-

ly, Mr. Sheehan was asked if he knew appellant was going to a psychologist when he hired him. (N.T. 12/2/88 p. 117).

The Commonwealth objected to this question and a lengthy discussion ensued at sidebar. (N.T. 12/2/88 pp. 119–125). The Commonwealth argued that the lawsuit against the Salvation Army had nothing to do with appellant's psychological history, but rather was prompted by the discovery that the Salvation Army knew appellant had a record for violent criminal conduct, information they withheld from Sheehan and his wife. Trial counsel argued that the questions were designed to cast suspicion on Mr. Sheehan's credibility. (N.T. 12/2/88 pp. 117–120). The trial court ruled that the defense had opened the door regarding the motivation for the lawsuit. Thereupon, the Commonwealth enquired of Mr. Sheehan why he filed suit and Mr. Sheehan responded "[t]hey lied to me about the fact that Arthur in fact had a record of violent crime." (N.T. 12/2/88 p. 126).

■ Appellant argues that trial counsel was ineffective in pursuing the original line of questioning with Mr. Sheehan's as counsel opened the door to testimony revealing appellant's prior criminal record. We agree with the PCRA court that this claim fails as appellant cannot establish prejudice. *Travaglia, supra.* Before the jury heard this single remark referencing prior criminal conduct, they had heard excruciating details regarding the heinous nature of the multiple crimes committed by appellant on April 1, 1988. The jury had heard eyewitness testimony detailing the brutal murder of Ms. Killoran, the assaults on a pregnant Ms. Jensen and her husband, Mr. Sheehan. The jury had also heard testimony about the discovery of Ms. Dorner's body tied to chair, the victim of a sexual assault prior to being stabbed to death. It is highly unlikely that the outcome of appellant's trial would have been different absent the single statement of Mr. Sheehan referencing appellant's prior criminal record. For this reason the claim for relief fails.

The third and final claim of error alleges the ineffectiveness of trial counsel for presenting testimony of defense expert Dr.

Gerald Cooke, during the penalty phase, which revealed appellant's prior criminal history. Appellant avers that counsel simply should not have asked any questions of this witness that revealed details of appellant's prior criminal activities. Appellant argues that this information was not needed as the witness could simply have testified about appellant's mental state without reference to this information. Appellant argues that the prejudicial effect of this testimony is obvious as the jury imposed the death penalty.

The PCRA court did not address the merits of this issue, finding that it was not cognizable under the PCRA. The lower court held that the PCRA only provides relief for issues affecting the truth-determining process. Penalty phase issues do not affect the truth-determining process as they arise after guilt or innocence has already been adjudicated, and thus, are not cognizable. (PCRA court slip opinion, 10/3/77, p. 7). In *Commonwealth v. Chester*, 557 Pa. 358, 733 A.2d 1242, 1248 (1999), we addressed this precise issue and held that penalty phase issues were in fact cognizable under the PCRA.

> [W]e do not read the phrase "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place" to preclude review of claims arising from the penalty phase of a capital case. Accordingly, we hold that claims alleging a violation of the constitution of this Commonwealth or the United States, or alleging ineffective assistance of counsel, which affected the reliable adjudication of the penalty in a capital case are cognizable under the PCRA in a first PCRA petition.

As appellant alleges ineffective assistance of counsel, which affected the reliable adjudication of innocence or guilt of the death penalty, the claim is cognizable. Although we find the PCRA court erred in failing to address this claim, the record is sufficient for this court to review the merits of the allegation.

Appellant's defense to the charges at issue was guilty but mentally ill, a defense which is relevant only in the penalty phase of a capital case. *Faulkner*, 595 A.2d at 36; 42 Pa.C.S.

§ 9711(e)(2) & (3). A defensive plea of guilty but mentally ill does not deny commission of the criminal act, rather it affirmatively argues that the accused suffered from a mental defect or disease at the time of criminal act.[3] In support of this defense Dr. Cooke testified that appellant suffered from paranoid schizophrenia and at times is psychotic. (N.T. 12/6/88 pp. 27–28). Dr. Cooke opined that appellant perceived the victims in the present case as wanting to have sex with him, then falsely accusing him of rape. Appellant's perceptions were not reality-based and his response to events arose from his paranoia. (N.T. 12/6/88 pp. 36–37). In support of this assessment Dr. Cooke referenced a previous incident where appellant, suffering from a similar delusion, raped his 72 year-old neighbor. (N.T. 12/6/88 p. 28). Dr. Cooke also testified that in evaluating appellant he conducted a clinical interview, took a history from the patient, which included all prior criminal conduct, administered psychological tests and reviewed all pertinent mental records, which included psychological evaluations from appellant's previous incarcerations. (N.T. 12/6/88 pp. 10–11).

Appellant's objection to the testimony of Dr. Cooke is that it referenced his prior convictions for rape and breaking and entering. Appellant correctly notes that the Commonwealth could not have presented evidence of his prior convictions, as only one was a felony. *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861 (1990), *cert. denied* 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432; 42 Pa.C.S. § 9711(d)(9). Appellant theorizes that Dr. Cooke's testimony permitted the jury to consider an additional aggravating circumstance, and as the jury found the aggravating factors to outweigh the mitigating factors, he was clearly prejudiced. Appellant's argument is unpersuasive. It was necessary for Dr. Cooke to establish the criteria and methodology he utilized in reaching an opinion of appellant's mental state before that opinion could

---

3. Under the guilty but mentally ill provision, mentally ill is defined as "one who as a result of a mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." 18 Pa.C.S. § 314(c)(1).

be admitted. *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172, 176 (1978). Nor was appellant prejudiced by the admission of this information given the nature of his defense. Appellant was not denying commission of the crimes, he was arguing that he was mentally ill at the time he committed the offense. Under the circumstances, it was necessary for Dr. Cooke to reference the details of appellant's prior criminal acts, which supported his opinion that appellant committed crimes because of his mental state. Appellant's claim that counsel was ineffective for permitting the witness to testify to prior crimes fails.

Accordingly, for the reasons set forth herein, we affirm the denial of post-conviction relief.[4]

Justice NIGRO concurs in the result.

4. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case back to the Governor. 42 Pa.C.S. § 9711(i).